## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEDLEY CAPITAL CORPORATION,<br><br>       Plaintiff,<br><br>v.<br><br>FRONTFOUR CAPITAL GROUP LLC,<br>FRONTFOUR MASTER FUND, LTD,<br>FRONTFOUR CAPITAL CORPORATION,<br>FRONTFOUR OPPORTUNITY FUND,<br>HFR ASSET MANAGEMENT, L.L.C.,<br>DAVID A. LORBER,<br>STEPHEN E. LOUKAS,<br>ZACHARY R. GEORGE,<br>MOAB CAPITAL PARTNERS, LLC, and<br>NEXPOINT ADVISORS, L.P.,<br><br>       Defendants. | No. 19 Civ. 2055 (LTS) |

## COMPLAINT

1. Plaintiff Medley Capital Corporation ("MCC" or the "Company"), for its Complaint against Defendants FrontFour Capital Group LLC and FrontFour Capital Corporation (the "FrontFour Advisors"), FrontFour Master Fund, Ltd. and FrontFour Opportunity Fund (the "FrontFour Funds"), David A. Lorber, Stephen E. Loukas, Zachary R. George (collectively, "FrontFour"), Moab Capital Partners, LLC ("Moab"), HFR Asset Management, L.L.C. ("HFR"), and NexPoint Advisors, L.P. ("NexPoint"), alleges on knowledge as to itself and upon information and belief as to all other matters as follows:

## NATURE OF THE ACTION

2.      MCC, a publicly traded business development company,[1] has been forced to bring this action to protect the free exercise of the shareholder franchise in connection with a significant transaction that already has been impaired by Defendants' unlawful deception and manipulation.  MCC seeks damages and injunctive relief to prevent Defendants from continuing their unfair and illegal solicitation of MCC's shareholders in violation of federal securities laws.  Defendants' misconduct has violated the disclosure and proxy rules that govern shareholder solicitations, and it bars them from further soliciting MCC's shareholders.  MCC also seeks to recover the substantial expense MCC has incurred in responding to Defendants' unlawful conduct.

3.      Defendants are waging a coordinated campaign against a transaction (the "Merger") that would result in the combination of MCC, Medley Management Inc. ("MDLY") and Sierra Income Corporation ("Sierra").  In contrast to Defendants – who are acting to benefit themselves at the expense of other shareholders – the Merger parties structured the transaction with the goal of protecting the rights and interests of *all* shareholders.  The Board of Directors of each company formed special committees of independent, non-employee directors.  Each of those special committees concluded that the transaction would be fair to its shareholders.  The transaction will only proceed if it is approved by a majority of the unaffiliated shareholders of MCC and Sierra.

4.      The Supreme Court recognized more than fifty years ago that the proxy rules "stem[] from the congressional belief that '(f)air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.'" *J. I. Case Co. v.*

---

[1] A business development company ("BDC") is a type of closed-end investment fund that elects to be subject to certain provisions of the Investment Company Act of 1940 ("Investment Company Act").

*Borak*, 377 U.S. 426, 431 (1964) (second alteration in original) (quoting H. R. Rep. No. 1383, 73d Cong., 2d Sess., 13).  Violators of the proxy rules, like Defendants, "frustrate[ ] the free exercise of the voting rights of shareholders" by obscuring "the real nature of the questions" underlying the solicitation.  *Id*. (quoting H. R. Rep. No. 73-1383, at 13 (1934); S. Rep. No. 73-792, at 12 (1934)).

5.      Defendants FrontFour and Moab, which collectively own more than 5% of MCC's stock (the "Group Defendants"), have violated the securities laws by (1) failing to disclose on a Schedule 13D that they are acting as a group and (2) soliciting MCC's shareholders without filing a proxy statement as required by Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

6.      Section 13(d) of the Exchange Act and Rule 13d-1 require the members of any "group" – defined by Rule 13d-5 as two or more persons who have "agree[d] to act together for the purpose of acquiring, holding, voting or disposing of equity securities" – that collectively own 5% or more of an issuer's securities to publicly disclose on a Schedule 13D that they are collaborating.

7.      Even without the benefit of discovery, there is substantial evidence that the Group Defendants are acting as a group.  FrontFour and Moab accumulated their stakes in MCC during the same three-month period, and both issued strikingly similar "open letters" to MCC shareholders – only six days apart – through the same law firm.  FrontFour has admitted to exchanging telephone and text messages with Moab in which they discussed, in its words, "possible joint activity."  Remarkably, NexPoint's "proposal," which was issued days before the scheduled shareholder meeting, strongly resembles the types of proposals for which FrontFour and Moab previously advocated.

8.     FrontFour and Moab have a long history of connections, including overlapping senior management, managing accounts for a common investor, and using the same boutique law firm.  And they have used a common modus operandi in their activist campaigns, including nominating the same individual as a candidate for board seats in their respective activist campaigns.  Curiously, FrontFour's counsel denied to MCC that it also represents Moab, even though this counsel admittedly filed Moab's open letter with the SEC and has represented Moab on multiple other similar securities-related matters.  FrontFour and Moab's principals also share the same business DNA:  Moab's Director of Marketing co-founded FrontFour Capital. Before that, he and Defendants George, Lorber, and Loukas all worked at a defunct activist hedge fund called Pirate Capital LLC, which was investigated by the SEC for violations of Section 13(d).[2]

9.     The Group Defendants claim they are entitled to the exemption from the proxy requirement contained in Rule 14a-2(b)(1).  But that exemption is not available to shareholders like the Group Defendants who are required to report beneficial ownership of MCC's securities on a Schedule 13D and have not done so.

10.    Defendant NexPoint has also violated Section 14(a) by soliciting shareholders without filing a proxy statement.  In late January and early February, NexPoint solicited MCC shareholders by proposing an alternative transaction to which it would be a party and publishing press releases that misleadingly claimed that its alternative would offer shareholders $225 million of net value.  NexPoint does not qualify for the exemption from the proxy rules either because it has proposed an alternative transaction to which it would be a party.

---

[2] *Pirate Capital is Up to Its Eye-Patch in Trouble*, N.Y. Times (Sept. 29, 2006), https://dealbook. nytimes.com/2006/09/29/pirate-capital-is-up-to-its-eye-patch-in-trouble; Susan Pulliam, *Pirate Capital Loses Its Swagger*, Wall St. J. (Sept. 27, 2006), http://www.wsj.com/articles/SB115932259591175133.

It therefore violated Section 14(a) by failing to file a proxy statement. NexPoint has apparently realized its mistake, as it attempted to file a preliminary proxy statement – not understanding that it may not do so – on February 25, 2019.

11.    Defendants cannot now cure their violations. Once a shareholder issues a solicitation and claims the exemption rather than file a proxy statement, the shareholder is deemed to have made an "irrevocable election" to proceed down that path. Because Defendants did not file a proxy statement and do not qualify for an exemption, they must be enjoined from further solicitations.

12.    Defendants' solicitations also violate Section 14(a) and Rule 14a-9, because they are materially false or misleading. The Group Defendants violated Section 14(a)'s anti-fraud provision by failing to disclose that they had formed a Section 13(d) group, falsely implying to MCC shareholders that they are unrelated shareholders who independently oppose the Merger.

13.    NexPoint's solicitations falsely claim that its alternative proposal – in which Sierra acquires MCC, but not MDLY, and the surviving company enters into an external management agreement with NexPoint – would provide $225 million of net value to MCC shareholders. However, in reality, NexPoint would only provide $25 million to the combined company upfront. NexPoint's proposal calls for it to purchase "at least $50 million of the Surviving Company's Shares" following the transaction, but to use funds from MCC to pay for half of that. NexPoint's proposal also claims that it will save shareholders $27 million over three years through a new external management agreement, but does not explain how. Thus, much of the purported "value" for the alternative transaction is illusory.

14.    On information and belief, NexPoint's solicitation is also misleading because NexPoint does not intend to and cannot actually consummate the alternative transaction

it has proposed.

15.     NexPoint's solicitations have also included false statements about the independence of the members of the special committees formed by MCC and Sierra to consider the Merger.  For example, without any support, NexPoint made the inconsistent claims that: (1) the independent directors are "longtime friends" of MDLY's senior executives; and (2) that MDLY management had threatened the independent directors, creating an "understanding" that dissenters would be removed.  These baseless and contradictory accusations, which appear calculated to improperly influence the upcoming shareholder vote on the Merger, are barred by Rule 14a-9.

16.     The timing of Defendants' opposition to the Merger also points to foul play.  The Group Defendants purchased the overwhelming majority of their holdings *after* the Merger was announced in early August 2018.  Equally curious, the Group Defendants inexplicably waited until four months after the announcement to circulate their "open letters" to MCC's shareholders.  And NexPoint publicly disclosed its "proposal" to the MCC and Sierra boards came only *eight days* before the then-scheduled February 8, 2019 shareholder meeting on the Merger.  The timing suggests that Defendants' goal was purely to scuttle the vote, not to serve the interests of all MCC's shareholders.

17.     The Group Defendants' violations are open and flagrant and have continued after a January 15, 2019 in-person meeting requested by MCC's counsel, at which MCC's counsel explained to the Group Defendants that their actions have violated the securities laws, and demanded that they cease further illegal solicitations.  But Defendants' illegal conduct has continued unabated.

18.     As a result of Defendants' failure to comply with federal securities laws, MCC and its shareholders have been deprived of the information necessary to evaluate

6

Defendants' solicitation or their aims.  Defendants should not be granted an unfair advantage in their efforts to scuttle the Merger.  They must play by the same rules as all other shareholders.

19.     Moreover, Defendants' actions have caused MCC to suffer substantial monetary damages, including fees and expenses that would not have been incurred but for Defendants' improper actions.  MCC was forced to retain lawyers and investor-relations advisors to defend against Defendants' illegal solicitation at a substantial cost.  MCC management, moreover, has been – as Defendants intended – distracted with reacting to Defendants' attacks.  This, too, damaged MCC.  Defendants should be held liable for such harm.

## THE PARTIES

20.     Plaintiff MCC is a publicly traded Delaware corporation with a principal place of business at 280 Park Avenue, New York, NY.  BDCs like MCC, which invest in small and midsize businesses, were an important source of funding in the aftermath of the 2008 financial crisis, as lending from banks and other traditional sources of capital grew scarce.

21.     MCC started in early 2011 and currently has an investment portfolio of nearly $750 million in assets.  MCC deploys its investors' capital to lend directly to privately-held, middle-market companies underserved by the traditional banking system, enabling those companies to expand their businesses, refinance, and make acquisitions.

22.     Non-party MCC Advisors LLC is a limited liability company organized under the laws of Delaware.  MCC Advisors LLC serves as MCC's investment advisor pursuant to an investment management agreement between MCC and MCC Advisors LLC.

23.     Non-party Medley LLC is a limited liability company organized under the laws of Delaware.  Medley LLC is the parent company of MCC Advisors LLC and comprises a collection of investment advisor subsidiaries, like MCC Advisors LLC, that provide asset management services to various funds and separately-managed accounts.

7

24.     Non-party Sierra Income Corporation ("Sierra") is a BDC formed under the laws of Maryland.  Sierra's investment advisor is non-party SIC Advisors LLC, a limited liability company formed under the laws of New York, that, like MCC Advisors LLC, is a subsidiary of Medley LLC.

25.     Non-party Medley Management Inc. ("MDLY") is a publicly-traded Delaware corporation formed to facilitate public investment in Medley LLC's investment advisory business.  MDLY has full voting control over Medley LLC's asset management business, which includes its management of MCC and Sierra.

26.     Defendant FrontFour Capital Group LLC ("FrontFour Capital") is a limited liability company organized under the laws of Delaware, with a principal place of business at 35 Mason Street, Greenwich, CT 06830.  FrontFour Capital is an investment advisor that claims, as of December 13, 2018, to beneficially own approximately 3.7% – approximately two million shares – of MCC.

27.     Defendant FrontFour Master Fund, Ltd. ("FrontFour Master Fund") is a limited company formed under the laws of the Cayman Islands.  FrontFour Master Fund is an investment fund managed by FrontFour Capital.  As of November 2, 2018, FrontFour Master Fund claims that it directly owns approximately 1.6 million MCC shares.

28.     Defendant FrontFour Capital Corporation ("FrontFour Corp.") is an investment advisor formed under the laws of British Columbia, Canada.  As of November 2, 2018, FrontFour Corp. claims to beneficially own approximately 41,000 MCC shares.

29.     Defendant FrontFour Opportunity Fund is a mutual fund trust as formed under the laws of British Columbia, Canada, and managed by FrontFour Corp.  As of November 2, 2018, FrontFour Opportunity Fund claims that it directly owns approximately 41,000 MCC shares.

30.     Defendant David A. Lorber is a managing member and principal owner of FrontFour Capital and a principal owner and director of FrontFour Corp.  By virtue of those positions, Lorber claims to be the beneficial owner of approximately two million shares of MCC common stock, as of November 2, 2018.  Lorber has signed FrontFour's solicitations and is specifically identified as claiming an exemption under Rule 14a-2(b)(1).

31.     Defendant Stephen E. Loukas is a managing member and principal owner of FrontFour Capital and a principal owner and director of FrontFour Corp.  By virtue of those positions, Loukas claims to be the beneficial owner of approximately two million shares of MCC common stock, as of November 2, 2018.  Loukas has signed FrontFour's solicitations and is specifically identified as claiming an exemption under Rule 14a-2(b)(1).

32.     Defendant Zachary R. George is a managing member and principal owner of FrontFour Capital and a principal owner and director of FrontFour Corp.  By virtue of those positions, George claims to be the beneficial owner of approximately two million shares of MCC common stock, as of November 2, 2018.  George has signed FrontFour's solicitations and is specifically identified as claiming an exemption under Rule 14a-2(b)(1).

33.     Defendant Moab is a limited liability company formed under the laws of Delaware with a principal place of business at 152 West 57th Street, New York, NY.  Moab is an investment advisor that, as of November 14, 2018, claims to directly or beneficially own approximately 2.9% – approximately 1.5 million shares – of MCC common stock.

34.     Defendant HFR is a limited liability company formed under the laws of Delaware.  HFR is the investment advisor to non-party HFR ED FrontFour Master Trust, a trust formed under the laws of Bermuda that is sub-advised by FrontFour Capital.  HFR is also the investment advisor to non-party HFR ED Moab Master Trust, a trust formed under the laws of Bermuda that is sub-advised by Moab.

35.     Defendant NexPoint is a limited partnership formed under the laws of Delaware with its headquarters in Dallas, Texas. NexPoint is an SEC-registered investment advisor to the NexPoint Strategic Opportunities closed-end fund, NexPoint Real Estate Strategies interval fund, NexPoint Healthcare Opportunities interval fund, and NexPoint Capital, Inc. BDC. NexPoint is an affiliate of Highland Capital Management Fund Advisors, L.P. and Highland Capital Management, L.P.

## JURISDICTION AND VENUE

36.     This action arises under Sections 13(d) and 14(a) of the Exchange Act, 15 U.S.C. §§ 78m(d), 78n(a), and the rules and regulations promulgated thereunder.

37.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

38.     This Court has personal jurisdiction over each Defendant pursuant to 15 U.S.C. § 78aa.

39.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act, as amended, 15 U.S.C. § 78aa, because various acts or transactions constituting the offenses occurred in the Southern District of New York.

40.     Among other things, Defendants' unlawful solicitation materials were transmitted to and received by MCC, whose principal place of business is in this District. Those solicitation materials were filed with the SEC in anticipation and for the purpose of their distribution to MCC's shareholders, including shareholders located within this District, in order to encourage them to vote against the Merger at the special meeting of MCC's shareholders, which also is scheduled to be held in this District. Moab, whose principal place of business is in this District, entered into an agreement with the other Group Defendants to form a "group"

within the meaning of Rule 13d-5 without disclosing the existence of that group as required by Section 13(d) of the Exchange Act and Rule 13d-1.

## FACTUAL BACKGROUND

### A.  MCC, Sierra, and MDLY Agree to the Mutually Beneficial Merger

41.    Competition for investment opportunities in the markets that BDCs like MCC pursue – small and midsize companies seeking financing – is intensifying.  Investors who historically have not targeted that segment, like hedge funds, have begun to move into that market as they search for new opportunities, adding competition in an environment already crowded with an increasing number of BDCs.

42.    Larger BDCs have a significant competitive advantage in their market because their greater resources allow them to pursue a wider range of investment opportunities. They can also leverage their asset base to access capital at lower rates and gain access to funding sources unavailable to smaller BDCs, which they can use to magnify their investment power.

43.    Despite having nearly $750 million in assets, MCC is, as of December 2018, only the 23rd-largest BDC.  MCC has struggled to compete with larger funds that have more resources, more capital to deploy, and more funding available to leverage their asset bases.

44.    In the summer of 2018, Medley LLC, the parent company to both MCC's and Sierra's investment advisors, approached the two BDCs with a proposal to merge MCC into Sierra (the "Medley Advisors Proposal" or "Proposal").  Together, the combined company would become the 7th-largest publicly-traded BDC, which in turn would create more investment opportunities, give the company greater financing flexibility, and offer the potential to secure a higher credit rating, thereby lowering the company's cost of capital and unlocking new sources of funding.

45.     The Proposal also contemplated that the combined company would acquire MDLY, the parent company of the Medley asset management family, thereby bringing the investment management team that currently provides investment management services to MCC and Sierra into the merged BDC.  Integrating the investment management team will better align the interests of that team and the fund and result in the creation of the nation's second largest internally-managed BDC.  Shares of internally-managed BDCs tend to perform better in the market relative to the funds' asset value.

46.     From the moment that MCC, Sierra, and MDLY began to consider the Medley Advisors Proposal, the boards and management of all three companies structured the process to fully protect the rights and interests of their unaffiliated shareholders.  Those protections included forming special committees of independent, non-employee directors tasked with ensuring that any ultimate transaction was fair to shareholders.  Each special committee retained an independent financial advisor and was represented by independent outside counsel. None of these financial advisors or attorneys had any material pre-existing relationship with any of the three companies.[3]  After reviewing the Proposal, each financial advisor concluded that it was fair to the unaffiliated shareholders.

47.     In June 2018, the MCC board tasked its special committee of independent directors (the "MCC Special Committee") with evaluating the Medley Advisors Proposal.  The MCC board empowered the MCC Special Committee to hire its own independent legal and financial advisers to enable it to evaluate whether the Proposal, or any alternative to it, would be

---

[3] Although two financial advisors had prior engagements with other entities, the relevant special committees investigated those engagements and determined that they would not adversely affect the advisors' abilities to render independent advice.

in the MCC shareholders' best interests.  The MCC board agreed not to recommend the Proposal to MCC shareholders unless it was approved by the MCC Special Committee.

48.     In early August 2018, the MCC Special Committee, after consulting with its independent financial and legal advisors and considering the fairness opinion issued by its independent financial advisor, determined that the Proposal was in the MCC shareholders' best interests.  The MCC Special Committee recommended the transaction to the MCC board.

49.     Under the terms of the Merger, MCC shareholders are set to receive 0.8050 shares of common stock in the combined company in exchange for each share of MCC common stock, an increase the MCC Special Committee negotiated from an exchange ratio of 0.72 that Medley LLC proposed.  In addition to the benefits MCC shareholders will receive from pooling MCC's and Sierra's assets and internalizing the companies' asset management services, the MCC Special Committee concluded that combining the companies would create a more diversified balance sheet, provide more liquidity to MCC's shareholders through a substantially larger market capitalization, and provide the combined entity with a new income stream through its ownership of MDLY's investment advisory business.

50.     The MCC board accepted the Special Committee's recommendation and recommended approval of the Merger to MCC's shareholders.

51.     Independent special committees formed by the boards of MDLY and Sierra likewise concluded that the proposal was in the best interests of their respective companies' shareholders.  Their boards accepted those recommendations and determined to recommend approval of the Merger to their companies' respective shareholders.

52.     On August 9, 2018, the three companies jointly announced that they had entered into agreements for Sierra to acquire MCC and MDLY, which would make the combined company the second-largest internally-managed BDC and the seventh-largest publicly-traded

BDC overall.  Those agreements require approval by the shareholders of all three companies at special shareholders' meetings.

53.     The three companies jointly filed with the SEC a preliminary proxy statement on November 6, 2018, and a definitive proxy statement on December 21, 2018.

54.     The special shareholders' meetings were initially scheduled for February 8, 2019.  On February 5, 2019, the companies announced that the special shareholders' meetings would be adjourned until early March 2019 because of the U.S. Government shutdown.

**B.  The Group Defendants Coordinate and Accumulate MCC stock**

55.     The Group Defendants quickly began collectively acquiring more than three and half million shares of MCC's stock, constituting 6.6% of MCC's outstanding common stock.  They did so rapidly, over a three-month period after the Merger was announced in early August 2018.  Indeed, as of June 30, 2018, none of the Group Defendants owned any MCC stock.

56.     On November 2, 2018, FrontFour Master Fund notified MCC that it intended to nominate two directors – Clifford Press and Defendant Lorber – to MCC's board at the MCC annual shareholder meeting, which is expected to occur before June 30, 2019.  It also notified MCC that it and the other FrontFour Defendants had agreed to solicit proxies for the nominees.

57.     FrontFour's notice disclosed that between July 2018 and October 2018, the FrontFour Funds and other accounts managed by the FrontFour Advisors accumulated 1,990,000 shares of MCC common stock, constituting approximately 3.7% of MCC's common stock, including approximately 300,000 shares acquired by HFR ED FrontFour Master Trust – a separately-managed account for an investor that appears to be also advised by Moab.  The notice

also disclosed that Defendants Lorber, Loukas, and George each are deemed to beneficially own the total amount of MCC shares collectively owned by the FrontFour entities.

58. Similarly, Moab disclosed in an SEC filing on November 14, 2018, that it had acquired direct or beneficial ownership of 1,553,412 shares – or approximately 3% – of MCC common stock between July 2018 and September 2018.

**C. The Group Defendants Act In Concert to Oppose Mergers – Who is FrontFour a Front For?**

**i.  *The Group Defendants Issue Coordinated Open Letters to MCC Shareholders***

59. The Group Defendants then began their coordinated campaign of publicly criticizing the Merger and MCC's governance using false and misleading statements. This coordinated effort to sway shareholders – undisclosed in violation of the SEC's proxy rules – began some four months after the Merger was announced.

60. On December 13, 2018, FrontFour issued an "open letter" to MCC's shareholders urging them to vote against the transaction. Defendants George, Lorber, and Loukas all signed FrontFour's letter.

61. Six days later, Moab also issued an "open letter" urging MCC's shareholders to reject the transaction.

62. Neither open letter complied with the proxy solicitation requirements under Rules 14a-3 to 14a-6. Instead, both FrontFour and Moab issued their letters with a Notice of Exempt Solicitation pursuant to Rule 14a-6(g). Lorber, Loukas, and George were all specifically identified as claiming the exemption. The Group Defendants were presumably relying on the exemption set forth in Rule 14a-2(b)(1), which exempts from Rules 14a-3 to 14a-6 (other than paragraphs 14a-6(g) and 14a-6(p)) "[a]ny solicitation by or on behalf of any person who does not, at any time during such solicitation, seek directly or indirectly . . . the power to act

15

as proxy for a security holder and does not furnish or otherwise request . . . a form of revocation, abstention, consent or authorization."  17 C.F.R. § 240.14a-2(b)(1).

63.    The Group Defendants' letters contain remarkable similarities that cannot be coincidental.  They use the same buzzwords and phraseology:

- FrontFour's letter claims that MCC's management has a "track record of destroying value," while Moab's letter claims that MCC's management has a "track record of chronic and precipitous share price decline."

- FrontFour's letter labels the process the independent MCC Special Committee followed "highly flawed," while Moab calls it "deeply flawed."

- FrontFour's letter faults the fairness opinion provided by the MCC Special Committee's independent financial advisor, Sandler O'Neill, because it "does not address the form or structure of the Transaction or . . . the relative merits of the Transaction as compared to any other alternative transactions or business strategies that might exist for the Company." Moab's letter faults Sandler's opinion because it "did not consider the form or structure of the proposed Transaction or compare to any alternative transactions or business strategies that might exist for the Company."

The letters also single out the same BDC – Triangle Capital, a fund that sold its asset portfolio in early 2018 – as a supposed yardstick that MCC shareholders should use to evaluate the proposed Merger.

64.    Further, both letters were filed with the SEC by the same filer bearing the "Central Index Key" of 0000921895.  Public records reveal that this CIK belongs to the law firm Olshan Frome Wolosky LLP ("Olshan").

65.    Counsel at Olshan recently denied that the firm represents Moab in connection with its investment in MCC, stating, "We do not represent Moab in Medley."  But that denial is flatly inconsistent with the fact that Olshan filed Moab's letter with the SEC.  The denial is also less plausible in light of Olshan's prior representation of Moab in its activist

campaigns, including in connection with its stakes in Macquarie Infrastructure Corporation and Perceptron, Inc.

ii.    *FrontFour Relies on Moab's Open Letter to Shareholders in Its Recent Section 220 Demand Letter*

66.    On December 28, 2018, nearly five months after the merger was announced, MCC received a demand on behalf of FrontFour Capital, pursuant to section 220 of the Delaware General Corporation Law, seeking to inspect a vast number of MCC books and records.

67.    The demand letter repeatedly refers to the open letter to MCC shareholders published by Moab (referred to as FrontFour Capital's "fellow shareholder"), and attached the Moab letter as an exhibit.

iii.    *FrontFour Files a Section 220 Demand Lawsuit in Delaware Court of Chancery Littered with References to Moab*

68.    On January 11, 2019, FrontFour Capital filed a complaint in the Delaware Court of Chancery, seeking to compel production of the books and records demanded in its December 28, 2018 letter.  On January 14, 2019, FrontFour filed an amended complaint.  The circumstances of the Section 220 demand action demonstrate that FrontFour Capital brought it as part of the Group Defendants' attempt to obstruct the shareholder vote, rather than to seek substantive material.

69.    FrontFour filed the complaint seeking to compel production only eight business days after it had served MCC with its demand for a broad swath of documents across fifteen categories and nine additional sub-categories, and only twenty-four hours after the parties executed a confidentiality agreement to govern the production.  In that short time – as MCC informed FrontFour – MCC and the MCC Special Committee already had started to collect documents that were responsive to the demand.  One day before FrontFour filed suit, MCC had

agreed to the confidentiality agreement that FrontFour proposed in connection with its demand, with only minimal requested revisions.  MCC has been moving at this rapid pace even though FrontFour clearly sat on its rights by waiting nearly five months after the deal was announced to make a demand.  The Merger was publicly announced on August 9, 2018 and the preliminary proxy statement with respect to the Merger was filed with the SEC on November 16, 2018. Rather than act on its supposed concerns in a timely manner (let alone expeditiously), FrontFour dithered for months, waiting until the Friday before New Year's to make its demand.

70.    Like the demand letter, the Delaware complaint seeking to compel production implies there is no connection between FrontFour and Moab – misleadingly referring to Moab as just "another significant shareholder."  But it is rife with references to Moab's open letter.  Further, FrontFour is represented in the Section 220 demand proceeding by Olshan, the same firm that filed with the SEC both FrontFour's and Moab's open letters.

### iv.    FrontFour Sues in Delaware to Block the Merger Relying on Similar Allegations Involving Moab

71.    On February 11, 2019, FrontFour Capital Group and FrontFour Master Fund sued MCC, Medley, Sierra, and MCC's directors in the Delaware Court of Chancery, seeking to enjoin the Merger.  Despite having waited to file this suit for more than six months after the Merger was announced, the FrontFour plaintiffs requested expedited proceedings and a trial before the stockholder vote scheduled for March 8, 2019, less than a month later.

72.    As with the open letter and the Section 220 demand complaint, the preliminary injunction complaint contains an extensive discussion of Moab's December 19th letter, misleadingly described Moab as just "another stockholder" with "similar concerns."

73.     So while FrontFour continues to maintain, in this latest salvo, that they and Moab are just like-minded MCC investors, Defendants' record of deceptive conduct and undisclosed relationships raises the question:  Who is FrontFour a front for?

> *v.*     ***FrontFour Admits to Discussing "Possible Joint Activity" with Moab***

74.     On January 15, 2019, MCC's counsel met with counsel for FrontFour and raised concerns about FrontFour's ongoing violations of the federal securities laws.

75.     In correspondence that followed, FrontFour's counsel sent a letter that purported to defend its conduct but also made a number of startling admissions:

- "***FrontFour and Moab have . . . discussed possible joint activity***" in connection with the Merger;

- FrontFour and Moab have exchanged telephone phone calls and text messages regarding the Merger; and

- "***Olshan assisted Moab in filing the Notice of Exempt Solicitation***."

76.     Tellingly, FrontFour devoted the overwhelming majority of its letter to wrongheaded justifications for its conduct, burying a denial of its formation of a group with Moab in the 14th paragraph of a 17-paragraph letter.

77.     Worse, the Group Defendants continued their illegal solicitations after being informed by MCC's counsel that their conduct was unlawful, including the issuance of a press release and investor presentation to MCC shareholders on January 18, 2019.  FrontFour did not furnish a proxy statement with those solicitations, again incorrectly purporting to rely on the exemption under Rule 14a-2(b)(1).

78.     Moreover, on information and belief, the Group Defendants' solicitation efforts have extended beyond "open letters" to shareholders, and have included direct discussions with at least one significant MCC shareholder regarding how that shareholder would vote its MCC shares with respect to the Merger.  In particular, a portfolio manager at one MCC

19

shareholder, which voted 2,640,682 shares of the Company's common stock with FrontFour, acknowledged on January 31, 2019 that he had previously met with representatives of FrontFour during a ski trip in Whistler, British Columbia, and discussed voting strategy with respect to the Merger.

### vi. The Group Defendants' Actions Are Consistent with Their Long History of Coordination

#### a. The Group Defendants Have a Common Limited Partner

79. FrontFour and Moab both appear to be currently managing trust assets for the same investor through trusts organized and managed by HFR on HFR's investment platform.

80. HFR is acting as the advisor to two trusts: "HFR ED FrontFour Master Trust" and "HFR ED Moab Master Trust." On information and belief, HFR has arranged for FrontFour Capital to act as the sub-advisor for the former and for Moab to act as sub-advisor for the latter.

81. On information and belief, in connection with HFR's advisory activities, HFR has entered into sub-advisor contracts with both FrontFour and Moab. In accordance with those subadvisor agreements, on information and belief, FrontFour and Moab are both agents of HFR and share a contractual common agency as between each other.

82. Discovery will likely reveal that HFR ED FrontFour Master Trust owns approximately 300,000 shares of MCC common stock.

83. Further discovery will likely reveal that HFR ED FrontFour Master Trust and HFR ED Moab Master Trust have the same beneficial owner and that FrontFour Capital, HFR, and Moab are acting in concert in connection with these trusts.

### b. *The Group Defendants Use the Same Nominee in Proxy Contests*

84.     Out of all the potential nominees in the world, FrontFour and Moab have each nominated the same person – James E. Hyman – for directorships in connection with activist campaigns, such as FrontFour's nomination of Hyman for a seat at Sensient Technologies, Moab's nomination of Hyman for a seat at Mac-Gray Corporation, and FrontFour's nomination of Hyman for a seat at ILG, Inc.

### c. *The Group Defendants' Senior Management Have a Common Business DNA*

85.     The Group Defendants' senior managers share a business history:  Andrew Stotland, who is currently Moab's director of marketing, founded FrontFour Capital Group along with Defendants Lorber, George, and Loukas.  The four of them started FrontFour Capital after working together at Pirate Capital LLC, a defunct activist hedge fund that was investigated by the SEC for potential violations of Section 13(d) in connection with its trading activity.

86.     On information and belief, discovery may reveal that the undisclosed group includes additional members.  For example, BLR Partners LP, which claims to own 2% of MCC's outstanding shares, previously worked with Olshan to elect Clifford Press – the very same individual FrontFour has nominated to MCC's board of directors – to the board of directors of Acacia Research Corporation ("Acacia").  FrontFour's letter nominating Lorber and Press to MCC's board of directors disclosed that it has formed a group with Acacia within the meaning of Section 13(d)(3) for the purposes of soliciting for Press's and Lorber's election.  BLR thus worked with the same law firm as FrontFour to nominate the same individual to the board of a corporation that is already part of a shareholder group with FrontFour.  BLR has also issued a press release opposing the Merger.

### D. NexPoint Publicly Advocates for an Alternative Transaction in Which It Would Participate Merely Seven Days Before the Scheduled Meeting

87.     On January 24, 2019, NexPoint sent a letter to the MCC Special Committee, purporting to propose that, instead of consummating the Merger, MCC enter into an external advisory agreement with NexPoint.  The MCC Special Committee and MCC board considered NexPoint's proposal and determined it was not likely to lead to a "superior proposal" as that term is defined in the Merger Agreement.

88.     One week later, on January 31, 2019, NexPoint sent another letter to the MCC Special Committee, as well as a substantially similar letter to the special committee of the Sierra board.  This letter included a proposal under which MCC would merge with Sierra, but not MDLY, and the combined entity would enter into an external advisory agreement *with NexPoint.*

89.     NexPoint also copied Institutional Shareholder Services Inc. ("ISS"), an independent proxy advisory firm, on its letter to the Special Committee, suggesting that NexPoint's purpose in issuing the letter was to encourage ISS to change its recommendation on the pending Merger and influence the shareholder vote on the Merger.

90.     Just one day later, on February 1, 2019, NexPoint issued a public press release touting its "proposal," and urging "the MCC and Sierra Boards to . . . adjourn the special shareholder meeting currently scheduled for February 8, 2019, and inform shareholders that a competing offer has been received from NexPoint and is currently being evaluated."

91.     NexPoint's press release contains multiple false and misleading statements.  For example, NexPoint claims that its alternative proposal "offers $225 million of net value in favor of shareholders over existing proposal."  That statement is misleading, however, because NexPoint is not offering to acquire any shares from MCC shareholders and

NexPoint's proposal offers only a $25 million payment in immediate cash to the combined company.  The remainder of NexPoint's claimed "$225 million of net value" comes from various speculative sources, including the "retention" by the combined company of $100 million in cash by not consummating the MDLY transaction, tens of millions of dollars in opaque, so-called "fee savings," and future potential purchases of surviving company shares to be paid from NexPoint's incentive fee payments if and only if future unspecified performance measures are achieved (*i.e.*, an offer to purchase additional shares if MCC provides NexPoint with funds to do so).

92.     NexPoint's press release also misleadingly implies that NexPoint is ready, willing, and able to consummate a transaction on the terms outlined in the press release.  On information and belief, NexPoint does not have the resources or capability to follow through on the terms proposed in the press release; rather, the sole motivation for the release is to create the appearance of an illusory alternative transaction and to scuttle the Merger to advance the Defendants' collective goals.

93.     On February 4, 2019, FrontFour issued a press release in support of NexPoint's purported proposal.  FrontFour filed a Notice of Exempt Solicitation pursuant to Rule 14a-6(g) for that press release.

94.     NexPoint issued additional press releases on February 5, 2019, and February 7, 2019, each of which contained materially false or misleading statements regarding the independence of the MCC and Sierra Special Committees.

- NexPoint's February 5, 2019 press release falsely states:  Nexpoint has "reason to believe that the independent directors of MCC and Sierra are longtime friends of brothers Brook and Seth Taube, the co-founders and co-CEOs of MDLY, and that there is an understanding that management would seek the removal of any board member who speaks out against management proposals."

- NexPoint's February 7, 2019 press release falsely states: "NexPoint has reason to believe that MCC and Sierra's independent directors (Arthur Ainsberg, Karin Hirtler-Garvey, Mark Lerdal and John E, Mack for MCC, and Oliver T. Kane, Valerie Lancaster-Beal and Stephen R. Byers for Sierra) have longstanding relationships with brothers Brook and Seth Taube, MDLY co-founders and co-CEOs, that challenge the directors' independence.  Additionally, sources have indicated that there is an understanding among the MCC and Sierra independent directors that management would seek the removal of any board member who speaks out against management proposals."

95.     These false allegations about the purported lack of independence of the MCC and Sierra special committees appear calculated to sow confusion among shareholders and improperly influence the upcoming shareholder votes on the Merger.

96.     NexPoint has not furnished a publicly filed proxy statement in connection with its solicitation.  Rather, on February 4, 2019, NexPoint publicly filed a Notice of Exempt Solicitation with the SEC containing its February 1, 2019 press release.  And on February 5, 2019, it filed a Notice of Exempt Solicitation containing its press release of the same date.  But the exemption contained in Rule 14a-2(b)(1) does not apply to NexPoint because its solicitation proposed an alternative transaction to which it is a party.

### E. NexPoint Recognizes Its Error Too Late and Attempts to File a Preliminary Proxy Statement

97.     Apparently recognizing that its solicitations were not exempt, NexPoint attempted to file a preliminary proxy statement on February 25, 2019.  That preliminary proxy urged MCC shareholders to reject the Merger or to vote to adjourn the meeting.  The preliminary proxy also reveals that NexPoint plans to nominate two new independent directors if the Merger is rejected or postponed.  The materials filed with that preliminary proxy included a press release dated February 25, 2019, that restated Nexpoint's position in the preliminary proxy and another press release dated February 28, 2019, describing an action that one of Nexpoint's investment vehicles seeking books and records under DGCL §220.  The securities laws do not permit

NexPoint to reverse course in this fashion.  As the SEC explained in its Adopting Release, "any person who relies on Rule 14a-2(b)(1) for exempt communications will be ***deemed to have made an irrevocable election to maintain exempt status throughout the relevant soliciting period***." Regulation of Communications Among Shareholders, 57 Fed. Reg. 48,276, 48,281 (Oct. 22, 1992) (emphasis added).

98.     Nexpoint's pre-proxy solicitation is not the first time that NexPoint has disingenuously used an improper solicitation to attempt to blow up a transaction.  For example, in 2016, NexPoint made a written proposal to Business Development Corporation of America ("BDCA"), purportedly seeking to act as its investment adviser as an alternative to a previously announced transaction.  The BDCA special committee rejected NexPoint's proposal, noting among other things that NexPoint "lacks the experience the Special Committee seeks in and advisor," "has had poor performance," and "lacks the candor, forthrightness and integrity the Special Committee deems minimally necessary to warrant further consideration as a potential adviser for the Company."  The BDCA special committee further noted NexPoint's use of "an accounting gimmick" to inflate its apparent performance, its "highly litigious" track record, and that "NexPoint's fee proposal appears disingenuous, as it charges among the highest fees in the business development company industry to its existing business development company."

99.     NexPoint and its affiliates also have a troubling history, including:

- In 2005, NexPoint's President and its affiliate Highland Capital Management, L.P. ("Highland Capital") were sued for alleged violations of Section 13(d), claims that were ultimately rendered moot by Highland Capital's divestment of its position.

- In 2007, NexPoint's President consented to entry of judgment against him for violating Section 7A of the Clayton Act and agreed to pay a $250,000 civil penalty to resolve claims by the U.S. Department of Justice that he and Highland Capital failed to comply with Hart-Scott-Rodino premerger reporting requirements.

- In September 2014, Highland Capital settled SEC cease-and-desist proceedings regarding allegations that it violated the Investment Advisers Act of 1940 by making undisclosed cross trades between client and proprietary accounts.

**F. The Group Defendants' Conduct Violates Section 13(d) of the Exchange Act and Rule 13d-5(b)(1) by Failing To Disclose That They Are a "Group" that Owns Approximately 6.6% of MCC's Common Stock**

100.    Section 13(d) of the Exchange Act was enacted to prevent the rapid secret accumulation of stock in a publicly traded company without full and fair disclosure to shareholders.

101.    It provides:

[a]ny person who, after acquiring directly or indirectly the beneficial ownership of any equity security of [a publicly traded company] and is directly or indirectly the beneficial owner of more than five per centum of the class shall, within ten days after such acquisition . . . file with the [SEC] a [Schedule 13D].

15 U.S.C. § 78m(d).

102.    Under Rule 13d-5(b)(1), any "group formed" when two or more persons enter into such an agreement is "deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g)" of the Exchange Act, "of all equity securities of that issuer beneficially owned by any such persons."  17 C.F.R. § 240.13d-5(b)(1).

103.    Based on the foregoing allegations, and as discovery will further demonstrate, the Group Defendants are "act[ing] together for the purpose of acquiring, holding, voting or disposing" of their shares of MCC common stock as set forth in Rule 13d-5(b)(1).

104.    The Group Defendants are therefore deemed to have acquired beneficial ownership of the securities of MCC held by each other.

105.    In the aggregate, FrontFour is the beneficial owner of approximately 3.7% of MCC's common stock.

26

106.     In the aggregate, Moab is the beneficial owner of approximately 2.9% of MCC common stock.

107.     By virtue of the group that the Group Defendants have formed, they are together the beneficial owner of approximately 6.6% of MCC's common stock.

108.     Under Section 13(d) and Rule 13d-1, the Group Defendants were required to publicly disclose, on a Schedule 13D, various information about their group, including their beneficial ownership of the issuer's securities, any arrangements, understandings or relationships between them, whether they intend to acquire additional securities, and whether they intend to engage in an "extraordinary corporate" transaction.

109.     The Group Defendants have violated Section 13(d) and Rule 13d-1 by failing to publicly disclose that they have formed a group on a Schedule 13D filed with the SEC.

### G. Defendants' Public Communications in Opposition to the Merger Are Illegal Solicitations Under the Exchange Act

110.     Section 14(a) of the Exchange Act makes it "unlawful for any person . . . in contravention of such rules and regulations as the Commission may prescribe . . . to solicit . . . any proxy or consent or authorization in respect of any security." 15 U.S.C. § 78n(a)(1). "The purpose of [Section] 14(a) is to prevent . . . corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *Borak*, 377 U.S. at 431. "It was intended to 'control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which . . . (had) frustrated the free exercise of the voting rights of shareholders.'" *Id.* (alteration in original) (quoting H. R. Rep. No. 73-1383, at 13 (1934)).

111.     Rule 14a-3(a) provides that "[n]o solicitation subject to this regulation shall be made unless each person solicited is . . . furnished . . . with a publicly-filed . . . proxy statement." 17 C.F.R. § 240.14a-3(a).

27

112.    Rule 14a-1 defines "solicitation" broadly to include, among other things, "[t]he furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy."  17 C.F.R. § 240.14a-1(*l*)(1)(iii).

113.    The Group Defendants' "open letters" to MCC's shareholders opposing the Merger are thus "solicitations" subject to the requirements of Rule 14a-3(a).

114.    Likewise, NexPoint's press releases advocating for an alternative transaction, while denigrating the proposed Merger and urging an adjournment of the shareholder vote, are "solicitations" subject to the requirements of Rule 14a-3(a).

115.    Defendants failed to file and furnish proxy statements in connection with their solicitations, purporting to rely on an exemption under Rule 14a-2(b)(1).  *See* 17 C.F.R. § 240.14a-2(b)(1).  But that exemption is not available to solicitations fitting within certain categories and does not apply here.

116.    First, Rule 14a-2(b)(1) does not apply to solicitations by "[a]ny person who is required to report beneficial ownership of the registrant's equity securities on a Schedule 13D . . . unless such person has filed a Schedule 13D and has not disclosed . . . an intent, or reserved the right, to engage in a control transaction, or any contested solicitation for the election of directors."  *See* 17 C.F.R. § 240.14a-2(b)(1)(vi).  The Group Defendants are required to file a Schedule 13D and have not done so.

117.    Second, Rule 14a-2(b)(1) also does not apply to solicitations by "[a]ny person soliciting in opposition to a merger . . . recommended or approved by the board of directors of the registrant who is proposing or intends to propose an alternative transaction to which such person or one of its affiliates is a party."  *See* 17 C.F.R. § 240.14a-2(b)(1)(v).  NexPoint is soliciting in opposition to a merger recommended by the MCC board of directors

and is proposing an alternative transaction to which it is a party.

118.   Third, Rule 14a-2(b)(1) does not apply to solicitations by a "nominee for whose election as a director proxies are solicited," such as Defendant Lorber.  *See* 17 C.F.R. § 240.14a-2(b)(1)(iv).

119.   Fourth, Rule 14a-2(b)(1) does not apply to solicitations by any "interested person" of the registrant, "[w]here the registrant is an investment company."  *See* 17 C.F.R. § 240.14a-2(b)(1)(viii).  The Investment Company Act states that, when used with respect to an investment company, an "interested person" means any "affiliated person" of such company.  15 U.S.C. § 80a-2(19)(A)(i).  An "affiliated person" includes "any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting securities of such other person."  *Id.* § 80a-2(a)(3).  "Person" is defined as "a natural person or a company," and "company" is defined as, among other things, "any organized group of persons whether incorporated or not."  *Id.* § 80a-2(a)(8) & (28).  The Group Defendants collectively own at least 6.6% of MCC's outstanding common stock and have formed a "group" pursuant to Rule 13d-1 under the Exchange Act, so they must aggregate their holdings, causing the Group Defendants to be considered an interested person of MCC.

120.   Fifth, Rule 14a-2(b)(1) also does not apply to solicitations by "[a]ny person who, because of a substantial interest in the subject matter of the solicitation, is likely to receive a benefit from a successful solicitation that would not be shared pro rata by all other holders of the same class of securities, other than a benefit arising from the person's employment with the registrant."  *See* 17 C.F.R. § 240.14a-2(b)(1)(ix).  As previously noted, NexPoint has proposed an alternative transaction to which it is a party, the consummation of which would confer benefits not shared pro-rata by other MCC shareholders, including an external advisory agreement.  Additionally, on information and belief, the Defendants have engaged in hedging

activities in relation to their investment in MCC which would make the Defendants likely to receive a benefit that would not be shared pro rata by other MCC shareholders if their solicitation were successful.

121.    For each of those independent reasons, Defendants do not qualify for the exemption from the proxy rules.  Defendants have therefore violated Section 14(a) and Rule 14a-3 by failing to file a proxy.

122.    While NexPoint has since tried to cure its error by filing a preliminary proxy statement, the law does not permit it to do so.  In its Adopting Release, the SEC made clear that one who relies on Rule 14a-2(b)(1) for exemption is "deemed to have made an irrevocable election to maintain exempt status throughout the relevant soliciting period."  57 Fed. Reg. at 48,281.  Relying on this guidance, this Court has held that a stockholder has a binary choice:  (1) rely on an exemption and thus make "an irrevocable election to maintain exempt status throughout the relevant soliciting period," or (2) "comply fully with the proxy rules from the start."  *Cap. Real Estate Inv. Tax Exempt Fund Ltd. P'ship v. Schwartzberg*, 917 F. Supp. 1050, 1062 (S.D.N.Y. 1996).

### H.  Defendants' Conduct Separately Violates Exchange Act Rule 14a-9 by Making False and Misleading Representations

123.    Defendants' solicitations also violated Rule 14a-9, which prohibits false and misleading statements in shareholder solicitations.

124.    Rule 14a-9 requires that "[n]o solicitation subject to this regulation shall . . . contain[] any statement, which at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]"  17 C.F.R. § 240.14a-9.

125.    FrontFour's and Moab's open letters violated this prohibition by omitting the material information that FrontFour and Moab are members of a group.   The Group Defendants' group status is required to be disclosed by federal securities laws and is material to MCC's shareholders.

126.    Defendant NexPoint's solicitations also contained multiple false and misleading statements in violation of Rule 14a-9.   For example, NexPoint's press release claims that its alternative proposal would provide "$225 million of net value," when in fact NexPoint is not offering to acquire any MCC shares and is only offering to provide $25 million to the combined company at the outset of the transaction.   Additionally, NexPoint's press releases include false and misleading statements regarding the independence of the members of the MCC and Sierra Special Committees, including the inconsistent claims (1) that the independent directors are "longtime friends" of MDLY's senior executives; and (2) that MDLY management had threatened the independent directors, creating an "understanding" that dissenters would be removed.   These baseless accusations are barred by Rule 14a-9.

**I.    Defendants' Misconduct Is Causing Irreparable Harm**

127.    Due to Defendants' violations of federal securities laws, MCC and its shareholders have been, and will continue to be, irreparably harmed in the following respects:

(a)    Group Defendants' concealment of their coordinated campaign against the Merger is depriving MCC's shareholders of material information necessary to evaluate Defendants' solicitations and their aims.

(b)    Defendants' violations of the federal securities laws and the proxy rules are granting them an unfair advantage in their efforts to scuttle the Merger.

(c)    Defendants' unlawful conduct, if not halted, threatens the MCC shareholder's right to the fair and informed exercise of the shareholder franchise.

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of Section 13(d) of the Exchange Act and Rule 13d-1)
### (Against the Group Defendants)

128.    MCC repeats and re-alleges each and every allegation above as if set forth in full herein.

129.    Section 13(d) of the Exchange Act requires that investors acting as a group for the purpose of acquiring, holding, or trading the stock of an issuer disclose the group's existence and make plain their intentions through a Schedule 13D within ten days after group members collectively acquire the beneficial ownership of 5% or more of the issuer's stock.

130.    Rule 13d-5(b)(1) provides that when two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of the issuer's stock, the group shall be deemed to have acquired beneficial ownership for purposes of Section 13(d) of the Exchange Act.

131.    Item 4 of Rule 13d-101 provides that the reporting person must state the purpose for acquiring the issuer's stock, including describing any plans or proposals (i) to acquire additional stock or to sell it, (ii) to engage in "[a]n extraordinary corporate transaction, such as a merger, reorganization or liquidation," (iii) to sell or transfer a "material amount of assets" of the issuer, or (iv) to propose any change to the present board of directors or management of the issuer.  17 C.F.R. § 240.13d-101.

132.    The Group Defendants are acting as a group within the meaning of Rule 13d-5 and collectively are the beneficial owners of more than five percent of MCC's common stock.

133.    Despite their formation of a group, the Group Defendants have not filed a Schedule 13D with the SEC, and thus have failed to make the full and fair disclosure required by

the Exchange Act and the Rules, including:

(a)     Failing to disclose that the Group Defendants are members of a group pursuant to Section 13(d);

(b)     Failing to disclose the collective beneficial ownership of MCC's common stock by the Group Defendants;

(c)     Failing to disclose any arrangements, understandings or relationships between the Group Defendants;

(d)     Failing to disclose whether the Group Defendants intend to acquire additional MCC common stock; and

(e)     Failing to disclose whether the Group Defendants intend to engage in an "extraordinary corporate" transaction for MCC.

134.    Accordingly, the Group Defendants have violated, and continue to violate, Section 13(d) of the Exchange Act and Rule 13d-1 and 13d-101.

135.    MCC has no adequate remedy at law.

136.    Without the injunctive relief requested herein, MCC will suffer irreparable injury.  The Group Defendants' failure to disclose their "group" to the SEC and other MCC shareholders as required by the federal securities laws is depriving MCC and its shareholders of the information necessary to evaluate their solicitations and their aims and securing for the Group Defendants an unfair advantage in their efforts to scuttle the Merger.  Preliminary injunctive relief in advance of the special meeting of MCC's shareholders is necessary to ensure that MCC shareholders are not deprived of their right to the fair and open exercise of the shareholder franchise.

## COUNT II
**(Violation of Section 14(a) of the Exchange Act and Rules 14a-3 to 14a-6)**
**(Against all Defendants)**

137.    MCC repeats and re-alleges each and every allegation above as if set forth in full herein.

138.    Under Rule 14a-3(a) of the Exchange Act, 17 C.F.R. § 240.14a-3(a), "[n]o solicitation subject to this regulation shall be made unless each person . . . is furnished . . . with a publicly-filed written proxy statement."

139.    The Group Defendants' open letters and investor presentation to MCC's shareholders constitute "solicitations" subject to Rule 14a-3(a), but the Group Defendants have not filed a proxy statement or furnished one to MCC's shareholders.

140.    Likewise, Defendant NexPoint wrongly claimed exempt status when it issued press releases advocating for an alternative transaction and opposing the Merger, which plainly constituted "solicitations" subject to Rule 14a-3(a).   Further, Defendant NexPoint purports to rely on the exemption in Rule 14a-2(b)(1) under the Exchange Act, but the exemption does not apply to any person who is opposing the Merger and who has "propose[d] an alternative transaction to which such person or one of its affiliates is a party."   17 C.F.R. § 240.14a-2(b)(1)(v).   While NexPoint subsequently realized that it does not qualify for the exemption and attempted to file a preliminary proxy statement, it cannot do so.   In its Adopting Release, the SEC made clear that one who relies on Rule 14a-2(b)(1) for exemption is "deemed to have made an irrevocable election to maintain exempt status throughout the relevant soliciting period."   57 Fed. Reg. at 48,281.   Accordingly, it is bound by its irrevocable election of exempt status for the duration of the solicitation period.

141.    Defendants purport to rely on the exemption in Rule 14a-2(b)(1) under the Exchange Act, to avoid complying with the proxy rules.   *See* 17 C.F.R. § 240.14a-2(b)(1).   The

exemption in Rule 14a-2(b)(1) is not available to shareholders making solicitations that fit into certain categories set forth in Rule 14a-2(b)(1)(i)-(ix).

142.     One such category is solicitation by shareholders who are required to report beneficial ownership of a registrant's equity securities on a Schedule 13D, unless they have filed a Schedule 13D and have not disclosed an intent, or reserved the right, to engage in a control transaction, or any contested solicitation for the election of directors.  *See* 17 C.F.R. § 240.14a-2(b)(1)(vi).  A second category is solicitation by any shareholder soliciting in opposition to a merger recommended or approved by the board of directors of the registrant who is proposing an alternative transaction to which such person is a party.  *See* 17 C.F.R. § 240.14a-2(b)(1)(v).  A third category is solicitation by a nominee for a position on the Board of Directors for whose election proxies are solicited, such as Defendant Lorber.  *See* 17 C.F.R. § 240.14a-2(b)(1)(iv).  A fourth category is solicitation by an "interested person" where the registrant is an investment company registered under the Investment Company Act of 1940, and as previously noted, the Group Defendants should be considered an interested person of MCC.  *See* 17 C.F.R. § 240.14a-2(b)(1)(viii).  A fifth category is solicitation by a person who because of a substantial interest in the subject matter of the solicitation, is likely to receive a benefit from a successful solicitation that would not be shared pro rata by all other holders of the same class of securities, as the Group Defendants would be likely to receive if they are engaged in hedging activities in relation to their investment in MCC.  *See* 17 C.F.R. § 240.14a-2(b)(1)(ix).

143.     Because the Defendants fall into the foregoing exceptions to the Rule 14a-2(b)(1) exemption, their failure to file a proxy statement thus violates Section 14(a) and Rule 14a-3.

144.     Defendants' solicitations have violated, and continue to violate, Section 14(a) of the Exchange Act and Rule 14a-3.

145.     MCC has no adequate remedy at law.

146.     Without the injunctive relief requested herein, MCC will suffer irreparable injury.  Defendants' failure to conduct their solicitation in compliance with the federal securities laws is depriving MCC and its shareholders of the information necessary to evaluate their solicitations and their aims and securing for Defendants an unfair advantage in their efforts to scuttle the Merger.  Preliminary injunctive relief in advance of the special meeting of MCC's shareholders is necessary to ensure that MCC shareholders are not deprived of their right to the fair and open exercise of the shareholder franchise.

147.     Separate and apart from the irreparable harm MCC has suffered and will continue to suffer, Defendants' actions have caused MCC to suffer substantial monetary damages, including fees and expenses that would not have been incurred but for Defendants' improper actions.  MCC was forced to retain lawyers, proxy solicitors, and investor-relations advisors to defend against Defendants' illegal solicitation at a substantial cost.   MCC management, moreover, has been – as Defendants intended – distracted with reacting to Defendants' attacks.  This, too, damaged MCC.

### COUNT III
### (Violation of Section 14(a) of the Exchange Act and Rule 14a-9)
### (Against all Defendants)

148.     MCC repeats and re-alleges each and every allegation above as if set forth in full herein.

149.     Rule 14a-9 under the Exchange Act, 17 C.F.R. § 240.14a-9, prohibits making a solicitation "by means of any . . . communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."

150.    The Group Defendants' open letters to shareholders and investor presentation filed with the SEC by Defendants and communicated to MCC shareholders, as well as NexPoint's press releases, constitute solicitations within the meaning of Rule 14a-9, pursuant to the definition set forth in Rule 14a-1(l), 17 C.F.R. § 240.14a-1(l).

151.    By failing to disclose that the Group Defendants are acting as a group within the meaning of Rule 13d-5 to campaign against the Merger, the Group Defendants' solicitations are false or misleading with respect to a material fact, or omitted to state a material fact necessary in order to make the statements therein not false or misleading.

152.    By stating in its solicitation that its proposed alternative proposal would provide "$225 million of net value," when in fact NexPoint is not offering to acquire any MCC shares and is only offering to provide $25 million to the combined company at the outset of the transaction, NexPoint's press release is false or misleading with respect to a material fact, or omits to state a material fact necessary in order to make the statements therein not false or misleading.

153.    Additionally, NexPoint's press releases are false or misleading to the extent they imply that NexPoint is ready, willing, and able to consummate the alternative transaction as proposed, when, in fact, on information and belief, NexPoint lacks the resources and capability to carry out the transaction.

154.    NexPoint's press releases also included false or misleading statements regarding the independence of the members of the special committees of outside directors formed by MCC and Sierra to consider the Merger.  In particular, NexPoint's press releases contain the materially false or misleading claim that the members of the MCC and Sierra special committees lack independence on the purported grounds that they have longstanding personal relationships MDLY's senior executives and that an "understanding" exists that MDLY

37

management would seek the removal of any independent MCC or Sierra director who spoke out against the Merger.

155.    Accordingly, Defendants violated Section 14(a) of the Exchange Act and the Rule 14a-9.

156.    MCC has no adequate remedy at law.

157.    Without the injunctive relief requested herein, MCC will suffer irreparable injury.  Defendants' false or misleading solicitations are depriving MCC and its shareholders of the information necessary to evaluate their solicitations and their aims and securing for Defendants an unfair advantage in their efforts to scuttle the Merger.  Preliminary injunctive relief in advance of the special meeting of MCC's shareholders is necessary to ensure that MCC shareholders are not deprived of their right to the fair and open exercise of the shareholder franchise.

158.    Separate and apart from the irreparable harm MCC has suffered and will continue to suffer, Defendants' actions have caused MCC to suffer substantial monetary damages, including fees and expenses that would not have been incurred but for Defendants' improper actions.  MCC was forced to retain lawyers, proxy solicitors, and investor-relations advisors to defend against Defendants' false or misleading solicitations at a substantial cost. MCC management, moreover, has been – as Defendants intended – distracted with reacting to Defendants' attacks.  This, too, damaged MCC.

## PRAYER FOR RELIEF

WHEREFORE, MCC respectfully requests that the Court enter judgment against Defendants as follows:

(a)    Declaring the Group Defendants' failure to file a Schedule 13D a violation of Section 13(d) of the Exchange Act and Rules 13d-1, 13d-5 and 13d-101;

(b)     Entering a temporary restraining order, and preliminary and permanent injunctions prohibiting the Group Defendants from any trading in MCC common stock until they have filed the corrective disclosure required by Section 13(d) and Rules 13d-1, 13d-5 and 13d-101;

(c)     Enjoining the Group Defendants from voting any shares acquired until they file a true and accurate Schedule 13D;

(d)     Declaring that Defendants are not eligible for the exemption from the proxy solicitation rules provided under Rule 14a-2(b)(1);

(e)     Declaring that Defendants' solicitation activities violated Section 14(a) of the Exchange Act and Rules 14a-3 to 14a-6 and 14a-9;

(f)     Enjoining Defendants from engaging in any action in furtherance of unlawful solicitation activity in connection with both the special meeting of the MCC shareholders and the annual meeting at which shareholders will elect directors;

(g)     Requiring Defendants to file with the SEC corrective disclosures consistent with their obligations under Section 14(a) and Rules 14a-3 to 14a-6 and 14a-9;

(h)     Awarding MCC, as damages, its reasonably incurred costs, fees, and expenses as a result of Defendants' unlawful activities;

(i)     Awarding MCC the costs and disbursements of pursuing this action, including, but not limited to, MCC's attorney's fees and expenses; and

(j)     Granting MCC such other and further relief as this Court may deem just and proper.

Dated:  March 5, 2019
        New York, New York

Steven F. Molo
Caleb Hayes-Deats
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022
Tel: (212) 607-8160
Fax: (212) 607-8161

*Attorneys for Medley Capital Corporation*