Steven F. Molo
Caleb Hayes-Deats
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022
(212) 607-8160
smolo@mololamken.com
chayes-deats@mololamken.com
*Attorneys for Plaintiff Medley Capital Corp.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MEDLEY CAPITAL CORPORATION,

                Plaintiff,

v.

NEXPOINT ADVISORS, L.P.,

                Defendant.

No. 19 Civ. 2055 (LTS)

**FIRST AMENDED COMPLAINT**

        Plaintiff Medley Capital Corporation ("MCC" or the "Company"), for its First Amended Complaint against Defendant NexPoint Advisors, L.P. ("NexPoint"), alleges on knowledge as to itself and upon information and belief as to all other matters as follows:

**NATURE OF THE ACTION**

        1.     MCC, a publicly traded business development company ("BDC"),[1] has been forced to bring this action to protect the free exercise of the shareholder franchise in connection with a significant transaction that has already been impaired by NexPoint's unlawful deception and manipulation. MCC seeks damages and injunctive relief to prevent NexPoint from continuing its unfair and illegal solicitation of MCC's shareholders in violation of federal

---

[1] A BDC is a type of closed-end investment fund that elects to be subject to certain provisions of the Investment Company Act of 1940.

securities laws.  NexPoint has violated the proxy rules that govern shareholder solicitations, and its misconduct bars NexPoint from further soliciting MCC's shareholders.  MCC also seeks to recover the substantial expense it has incurred in responding to NexPoint's unlawful conduct.

2.      The Supreme Court recognized more than fifty years ago that the proxy rules "stem[] from the congressional belief that '(f)air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.'"  *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) (second alteration in original) (quoting H. R. Rep. No. 73-1383, at 13 (1934)).  Violators of the proxy rules, like NexPoint, "frustrate[] the free exercise of the voting rights of shareholders" by obscuring "the real nature of the questions" underlying the solicitation. *Id*. (quoting H. R. Rep. No. 73-1383, at 13; S. Rep. No. 73-792, at 12 (1934)).

3.      NexPoint is waging a campaign against a transaction (the "Merger") that would result in the combination of MCC, Medley Management Inc. ("MDLY"), and Sierra Income Corporation ("Sierra").  NexPoint has violated Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") in two different ways.  First, NexPoint tried to solicit MCC shareholders under Rule 14a-2(b)(1), which exempts certain shareholder communications from the requirement of a proxy statement imposed by Rule 14a-3.  NexPoint's reliance on Rule 14a-2(b)(1) constituted an "***irrevocable election***" that bound NexPoint "***throughout the relevant soliciting period***."  Regulation of Communications Among Shareholders, 57 Fed. Reg. 48,276, 48,281 (Oct. 22, 1992) (emphasis added).  NexPoint did not qualify for Rule 14a-2(b)(1)'s exemption, and thus its solicitations violated Section 14(a) and Rule 14a-3.  Because NexPoint's election of the exemption was irrevocable, any further solicitation will also violate Section 14(a) and Rule 14a-3.  NexPoint has continued to solicit MCC shareholders and shows no sign of stopping.

4.     NexPoint apparently realized its mistake, because it later attempted to file preliminary and final proxy statements – not understanding that it may not do so.  NexPoint's proxy statements cannot justify further solicitation.  Communications under Rule 14a-2(b)(1) cannot "be used to pave the way for a regulated solicitation; one either must (1) rely on the exemption and remain out of the fray, or (2) comply fully with the proxy rules from the start." *Cap. Real Estate Inv. Tax Exempt Fund Ltd. P'ship v. Schwartzberg*, 917 F. Supp. 1050, 1062 (S.D.N.Y. 1996).  NexPoint relied on the exemption, and now must "remain out of the fray." *Id.*

5.     NexPoint's solicitations also violated Section 14(a) and Rule 14a-9, because they were materially misleading.  NexPoint solicited MCC's shareholders to vote against the Merger and in favor of an alternative transaction that would make NexPoint MCC's external investment advisor.  NexPoint's solicitations falsely claimed that its alternative proposal would provide $225 million of net value to MCC shareholders.  However, in reality, NexPoint would provide only $25 million upfront.  The remainder of the purported "value" is illusory.

6.     On information and belief, NexPoint's solicitation is also misleading because NexPoint does not intend to and cannot actually consummate the alternative transaction it has proposed.

7.     NexPoint's failure to comply with federal securities laws deprives MCC and its shareholders of the information necessary to evaluate NexPoint's solicitations and aims.  NexPoint should not be granted an unfair advantage in its efforts to scuttle the Merger.  It must play by the same rules as all other shareholders.

8.     NexPoint's actions have also caused MCC to suffer substantial monetary damages, including fees and expenses that would not have been incurred but for NexPoint's improper actions.  MCC was forced to retain lawyers and investor-relations advisors to defend

3

against NexPoint's illegal solicitation, at a substantial cost.  NexPoint should be held liable for such harm.

**THE PARTIES**

9.     Plaintiff MCC is a publicly traded Delaware corporation with a principal place of business at 280 Park Avenue, New York, NY.  BDCs like MCC, which invest in small and midsize businesses, were an important source of funding in the aftermath of the 2008 financial crisis, as lending from banks and other traditional sources of capital grew scarce.

10.     MCC started in early 2011 and currently has an investment portfolio of nearly $700 million in assets.  MCC deploys its investors' capital to lend directly to privately held, middle-market companies underserved by the traditional banking system, enabling those companies to expand their businesses, refinance, and make acquisitions.

11.     Non-party MCC Advisors LLC is a limited liability company organized under the laws of Delaware.  MCC Advisors LLC serves as MCC's investment advisor pursuant to an investment-management agreement between MCC and MCC Advisors LLC.

12.     Non-party Medley LLC is a limited liability company organized under the laws of Delaware.  Medley LLC is the parent company of MCC Advisors LLC and comprises a collection of investment advisor subsidiaries, like MCC Advisors LLC, that provide asset-management services to various funds and separately managed accounts.

13.     Non-party Sierra is a BDC formed under the laws of Maryland.  Sierra's investment advisor is non-party SIC Advisors LLC, a limited liability company formed under the laws of New York, that, like MCC Advisors LLC, is a subsidiary of Medley LLC.

14.     Non-party MDLY is a publicly traded Delaware corporation formed to facilitate public investment in Medley LLC's investment advisory business.  MDLY has full voting

4

control over Medley LLC's asset-management business, which includes its management of MCC and Sierra.

15.     Defendant NexPoint is a limited partnership formed under the laws of Delaware with its headquarters in Dallas, Texas.   NexPoint is an SEC-registered investment advisor to several affiliated funds.   NexPoint is an affiliate of Highland Capital Management Fund Advisors, L.P. and Highland Capital Management, L.P. ("Highland Capital").

## JURISDICTION AND VENUE

16.      This action arises under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and the rules and regulations promulgated thereunder.

17.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

18.     This Court has personal jurisdiction over NexPoint pursuant to 15 U.S.C. § 78aa.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 78aa because various acts or transactions constituting the offenses occurred in the Southern District of New York.

20.     Among other things, NexPoint's unlawful solicitation materials were transmitted to and received by MCC, whose principal place of business is in this District.  Those solicitation materials were filed with the SEC in anticipation and for the purpose of their distribution to MCC's shareholders, including shareholders located within this District, in order to encourage them to vote against the Merger at the special meeting of MCC's shareholders, which also is scheduled to be held in this District.

## FACTUAL BACKGROUND

**A.  MCC, Sierra, and MDLY Agree to the Merger**

21.     Competition for investment opportunities in the markets that BDCs like MCC pursue – small and midsize companies seeking financing – is intensifying.  Investors who historically have not targeted that segment, like hedge funds, have begun to move into that market as they search for new opportunities, adding competition in an environment already crowded with an increasing number of BDCs.

22.     Larger BDCs have a significant competitive advantage because their greater resources allow them to pursue a wider range of investment opportunities.  They can also leverage their asset base to access capital at lower rates and gain access to funding sources unavailable to smaller BDCs, which they can use to magnify their investment power.

23.     Despite its significant assets, MCC was, as of December 2018, only the 23rd-largest BDC.  MCC has struggled to compete with larger funds that have more resources, more capital to deploy, and more funding available to leverage their asset bases.

24.     In the summer of 2018, Medley LLC, the parent company to both MCC's and Sierra's investment advisors, approached the two BDCs with a proposal to merge MCC into Sierra (the "Medley Advisors Proposal" or "Proposal").  Together, the combined company would become a much larger, publicly traded BDC, which in turn would create more investment opportunities, give the company greater financing flexibility, and offer the potential to secure a higher credit rating, thereby lowering the company's cost of capital and unlocking new sources of funding.

25.     The Proposal also contemplated that the combined company would acquire MDLY, the parent company of the Medley asset-management family, thereby bringing the investment management team that currently provides investment-management services to MCC

and Sierra into the merged BDC.  Integrating the investment-management team will better align the interests of that team and the fund and result in the creation of the nation's second largest internally managed BDC.  Shares of internally managed BDCs tend to perform better in the market relative to the funds' asset value.

26.     The boards of MCC, Sierra, and MDLY each formed independent special committees to evaluate the Medley Advisors Proposal.  Ultimately, each special committee recommended that its respective company's board approve the Proposal.  Their boards accepted those recommendations and determined to recommend approval of the Merger to their companies' respective shareholders.

27.     On August 9, 2018, the three companies jointly announced that they had entered into agreements for Sierra to acquire MCC and MDLY, which would make the combined company one of the largest internally managed and publicly traded BDCs.  Those agreements require approval by the shareholders of all three companies at special shareholder meetings.

28.     The three companies jointly filed with the SEC a preliminary proxy statement on November 6, 2018, and a definitive proxy statement on December 21, 2018.

29.     The special shareholders' meetings were initially scheduled for February 8, 2019. On February 5, 2019, the companies announced that the special shareholders' meetings would be adjourned until March 2019.

## B. NexPoint Publicly Advocates for an Alternative Transaction in Which It Would Participate

30.     On January 24, 2019, NexPoint sent a letter to the special committee that MCC's board had created to evaluate the Merger.  NexPoint's letter proposed that MCC enter into an external advisory agreement with NexPoint instead of consummating the Merger.  The special committee, together with MCC's board, considered NexPoint's proposal and determined it was

not likely to lead to a "superior proposal" as that term was defined in MCC's, Sierra's, and MDLY's merger agreement.

31.     One week later, on January 31, 2019, NexPoint sent another letter to MCC's special committee, as well as a substantially similar letter to the special committee of the Sierra board.  This letter included a proposal under which MCC would merge with Sierra, but not MDLY, and the combined entity would enter into an external advisory agreement **_with NexPoint._**

32.     NexPoint also copied Institutional Shareholder Services Inc. ("ISS"), an independent proxy advisory firm, on its letter to the Special Committee, suggesting that NexPoint's purpose in issuing the letter was to encourage ISS to change its recommendation on the pending Merger and influence the shareholder vote on the Merger.

33.     Just one day later, on February 1, 2019, NexPoint issued a public press release touting its "proposal," and urging "the MCC and Sierra Boards to . . . adjourn the special stockholder meeting currently scheduled for February 8, 2019, and inform stockholders that a competing offer has been received from NexPoint and is currently being evaluated."

34.     NexPoint's press release contained multiple false and misleading statements. NexPoint claimed that its alternative proposal "offers $225 million of net value in favor of shareholders over [the] existing proposal."  That statement was misleading, however, because NexPoint's proposal offered only a $25 million payment in immediate cash to the combined company, which was significantly less than the value MDLY would contribute under the Merger. The remainder of NexPoint's "$225 million of net value" did not exist at all.

35.     First, NexPoint claimed that its proposal would save shareholders $125 million of cash that the Merger "siphons to MDLY." But that claim ignored the value that MCC and Sierra would receive from acquiring MDLY, which MCC calculated was worth $205 million.

36.     Second, NexPoint claimed that, under its proposal, it would purchase $50 million of the surviving company's shares. But buying shares at market value would not benefit shareholders, who could sell their shares to any purchaser at that price. And $25 million of NexPoint's proposed purchases would be made only "to the extent of incentive fees received from the Surviving Company." Such "investment" would merely send funds on a round trip, resulting in the surviving company paying NexPoint's incentive fees in stock, rather than cash.

37.     Finally, NexPoint claimed that its proposal would save $27 million on management fees over three years. But NexPoint's proposal did not include information about NexPoint's incentive fees, even though the proposal acknowledged that NexPoint would charge such fees. Without information about incentive fees, MCC shareholders could not evaluate whether the fee savings NexPoint promised would actually materialize.

38.     NexPoint's press release also misleadingly implied that NexPoint is ready, willing, and able to consummate a transaction on the terms outlined in the press release. On information and belief, NexPoint does not have the resources or capability to follow through on the terms proposed in the press release; rather, the sole motivation for the release is to create the appearance of an illusory alternative transaction and to scuttle the Merger.

39.     On February 4, 2019, NexPoint publicly filed a Notice of Exempt Solicitation with the SEC containing its February 1, 2019, press release. NexPoint submitted its Notice of Exempt Solicitation under Rule 14a-6(g), which requires anyone engaging in solicitation under Rule 14a-2(b)(1) to file communications with the SEC within three days. On February 5, 2019,

NexPoint filed a second Notice of Exempt Solicitation under Rule 14a-6(g) containing its press release of the same date.  NexPoint's February 5, 2019, press release repeated the misleading claims described above.

40.    The exemption contained in Rule 14a-2(b)(1) does not apply to NexPoint because, as explained below, NexPoint proposed an alternative transaction to which it would be a party and from which it would receive benefits it would not share with other stockholders.

### C.  NexPoint Recognizes Its Error Too Late and Attempts to File a Preliminary Proxy Statement

41.    Apparently recognizing that its solicitations were not exempt, NexPoint attempted to file a preliminary proxy statement on February 25, 2019.  That preliminary proxy urged MCC shareholders to reject the Merger or to vote to adjourn the meeting.  It also disclosed that NexPoint and its affiliates purchased their shares of MCC stock between January 31, 2019, and February 22, 2019.  Finally, the preliminary proxy revealed that NexPoint planned to nominate two new independent directors.

42.    On March 7, 2019, one day before shareholders were scheduled to vote on the Merger, NexPoint filed a definitive proxy statement.

43.    The securities laws do not permit NexPoint to reverse course in this fashion.  As the SEC explained in its Adopting Release, "any person who relies on Rule 14a-2(b)(1) for exempt communications will be ***deemed to have made an irrevocable election to maintain exempt status throughout the relevant soliciting period***."  Regulation of Communications Among Shareholders, 57 Fed. Reg. at 48,281 (emphasis added).  "[A] solicitation period ends and a new period begins when the electoral action for which shareholder proxies are solicited has been completed or otherwise concluded."  *Gas Nat. Inc. v. Osborne*, 624 F. App'x 944, 954 (6th Cir. 2015); *see also* 17 C.F.R. § 240.14a-4(d)(3) (proxy authorization extends to "meeting (and

any adjournment thereof)").

44. NexPoint's attempt to switch from exempt to regulated solicitations is not the first time that it has disingenuously used an improper solicitation to attempt to blow up a transaction. In 2016, NexPoint made a written proposal to Business Development Corporation of America ("BDCA"), purportedly seeking to act as its investment adviser in an alternative to a previously announced transaction.   The BDCA special committee rejected NexPoint's proposal, noting among other things that NexPoint "lacks the experience the Special Committee seeks in an advisor," "has had poor performance," and "lacks the candor, forthrightness and integrity the Special Committee deems minimally necessary to warrant further consideration as a potential adviser for the Company."   The BDCA special committee further noted NexPoint's use of "an accounting gimmick" to inflate its apparent performance, its "highly litigious" track record, and that "NexPoint's fee proposal appears disingenuous, as it charges among the highest fees in the business development company industry to its existing business development company."

45. NexPoint and its affiliates also have a troubling history, including:

- In 2005, NexPoint's President and its affiliate Highland Capital were sued for alleged violations of Section 13(d), claims that were ultimately rendered moot by Highland Capital's divestment of its position.

- In 2007, NexPoint's President consented to entry of judgment against him for violating Section 7A of the Clayton Act and agreed to pay a $250,000 civil penalty to resolve claims by the U.S. Department of Justice that he and Highland Capital failed to comply with Hart-Scott-Rodino premerger reporting requirements.

- In September 2014, Highland Capital settled SEC cease-and-desist proceedings regarding allegations that it violated the Investment Advisers Act of 1940 by making undisclosed cross trades between client and proprietary accounts.

**D.  Litigation in Delaware Delays MCC Shareholders' Vote on the Merger**

46. On February 11, 2019, two MCC shareholders filed a purported class action in the Delaware Court of Chancery (the "Delaware Action").   The plaintiffs in the Delaware Action

alleged that MCC's officers and directors had breached their fiduciary duties in connection with the Merger and that Sierra and other MCC affiliates had aided and abetted those breaches. As relief, the plaintiffs sought to enjoin (1) the vote by MCC shareholders on the Merger and (2) enforcement of certain terms in MCC's and Sierra's merger agreement.

47.     The Court of Chancery held a trial on March 6 and 7, 2019, and issued a decision on March 11, 2019. The Court held that Sierra had not aided and abetted any breaches of fiduciary duty, and thus denied the plaintiff's request to enjoin enforcement of the merger agreement. But the Court determined that MCC's directors had breached their fiduciary duties, and it enjoined a vote by MCC shareholders until after the Delaware defendants made corrective disclosures regarding the Merger.

48.     The Court of Chancery's decision briefly described NexPoint's proposal as a potential alternative that had been submitted to MCC's board. But the Court of Chancery did not purport to address whether NexPoint had complied with the securities laws or whether its description of its proposal was accurate.

49.     Following the Court of Chancery's decision, MCC adjourned the shareholder meeting concerning the Merger. On April 15, 2019, MCC entered into a binding term sheet with the Delaware plaintiffs. Under the term sheet, MCC agreed to seek Sierra's consent to amend the merger agreement to: (1) extend the date by which the parties must close the Merger, (2) permit MCC's special committee to undertake a 60-day "go shop" process to solicit superior transactions to the Merger, and (3) if the Merger is consummated, create a settlement fund to be distributed to members of the putative class in the Delaware Action. MCC also agreed to appoint two directors nominated by the Delaware plaintiffs to MCC's board and to work with the

Delaware plaintiffs to formulate corrective disclosures that complied with the Court of Chancery's decision.

50.     MCC anticipates that a shareholder vote on the Merger will occur no later than the third quarter of 2019.

### E. NexPoint Continues to Solicit in Opposition to the Merger and in Support of a Slate of Proposed Directors

51.     NexPoint has continued to solicit MCC's shareholders.  On April 1, 2019, NexPoint issued a press release urging MCC's directors to terminate the Merger and retain NexPoint as MCC's investment advisor.  NexPoint also reiterated its willingness to serve as investment advisor following a merger between MCC and Sierra, but reduced the value it attributed to that proposal from $225 million to "nearly $108 million."  NexPoint did not explain that reduction.

52.     On May 1, 2019, NexPoint began to solicit proxies for a slate of directors it hopes to elect at MCC's annual shareholder meeting, which is scheduled for June 4, 2019.  NexPoint's May 1 solicitation includes extensive descriptions of its various proposals for becoming the investment advisor to MCC or a successor entity.  NexPoint issued similar solicitations on May 13, 14, 16, 24, and 28, 2019.

53.     NexPoint's recent solicitations, while technically addressed to the election of MCC directors at the annual meeting, encourage shareholders to vote against the Merger at the special meeting that will occur this fall.  Those solicitations thus show that NexPoint will continue to violate the securities laws by soliciting MCC shareholders against the Merger.

### F. NexPoint's Public Communications in Opposition to the Merger Are Illegal Solicitations Under the Exchange Act

54.     Section 14(a) of the Exchange Act makes it "unlawful for any person . . . in contravention of such rules and regulations as the Commission may prescribe . . . to solicit . . .

13

any proxy or consent or authorization in respect of any security."  15 U.S.C. § 78n(a)(1).  "The purpose of [Section] 14(a) is to prevent . . . corporate action by means of deceptive or inadequate disclosure in proxy solicitation."  *Borak*, 377 U.S. at 431.  "It was intended to 'control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which . . . (had) frustrated the free exercise of the voting rights of shareholders.' "  *Id.* (alteration in original) (quoting H. R. Rep. No. 73-1383, at 13).

55.     Rule 14a-3(a) provides that "[n]o solicitation subject to this regulation shall be made unless each person solicited is . . . furnished . . . with [a] publicly-filed . . . proxy statement."  17 C.F.R. § 240.14a-3(a).

56.     Rule 14a-1 defines "solicitation" broadly to include, among other things, "[t]he furnishing of a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy."  17 C.F.R. § 240.14a-1(*l*)(1)(iii).

57.     NexPoint's press releases advocating for an alternative transaction are "solicitations" subject to the requirements of Rule 14a-3(a).  Indeed, NexPoint filed its February press releases with the SEC as purportedly "exempt solicitations."

58.     NexPoint initially attempted to solicit MCC shareholders without filing a proxy statement, claiming the exemption created by Rule 14a-2(b)(1).  *See* 17 C.F.R. § 240.14a-2(b)(1).  But that exemption is not available to solicitations fitting within certain categories and does not apply to NexPoint.

59.     Specifically, Rule 14a-2(b)(1) does not apply to solicitations by "[a]ny person soliciting in opposition to a merger . . . recommended or approved by the board of directors of the registrant ***who is proposing or intends to propose an alternative transaction to which such***

***person or one of its affiliates is a party***." *See* 17 C.F.R. § 240.14a-2(b)(1)(v) (emphasis added). NexPoint is soliciting in opposition to a merger recommended by the MCC board of directors and is proposing alternative transactions to which it would be a party.

60.     Second, Rule 14a-2(b)(1) also does not apply to solicitations by "[a]ny person who, because of a substantial interest in the subject matter of the solicitation, is likely to receive a benefit from a successful solicitation that would not be shared pro rata by all other holders of the same class of securities, other than a benefit arising from the person's employment with the registrant." *See* 17 C.F.R. § 240.14a-2(b)(1)(ix).   The consummation of NexPoint's proposed alternative transactions would confer benefits not shared pro-rata by other MCC shareholders, including an external advisory agreement with MCC or a successor entity.

61.     For each of those independent reasons, NexPoint does not qualify for the exemption from the proxy rules.   NexPoint's efforts to engage in exempt solicitation thus violated Section 14(a) and Rule 14a-3.

62.     While NexPoint has since tried to cure its error by filing a proxy statement, the law does not permit it to do so.  In its Adopting Release, the SEC made clear that one who relies on Rule 14a-2(b)(1) for exemption is "deemed to have made an irrevocable election to maintain exempt status throughout the relevant soliciting period."  57 Fed. Reg. at 48,281.  The relevant soliciting period does not conclude until "the electoral action for which shareholder proxies are solicited has been completed or otherwise concluded," *i.e.*, when shareholders vote on the Merger. *Gas Nat. Inc.*, 624 F. App'x at 954.  Relying on the SEC's Adopting Release, this Court has held that a stockholder has a binary choice:  (1) rely on an exemption and thus make "an irrevocable election to maintain exempt status throughout the relevant soliciting period," or (2) "comply fully with the proxy rules from the start." *Cap. Real Estate*, 917 F. Supp. at 1062.

The Court specifically disapproved of the course of action NexPoint has pursued here, where exempt communications are "used to pave the way for a regulated solicitation." *Id.*

63.     Because NexPoint made an irrevocable election to engage in exempt solicitation, it now has no choice but to remain "out of the fray" for the duration of the solicitation period. *Cap. Real Estate*, 917 F. Supp. at 1062.

## G.  NexPoint's Conduct Separately Violates Exchange Act Rule 14a-9 by Making False and Misleading Representations

64.     NexPoint's solicitations also violated Rule 14a-9, which prohibits false and misleading statements in shareholder solicitations.

65.     Rule 14a-9 requires that "[n]o solicitation subject to this regulation shall . . . contain[ ] any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]"  17 C.F.R. § 240.14a-9(a).

66.     Defendant NexPoint's solicitations contained multiple false and misleading statements in violation of Rule 14a-9.  NexPoint's February press release claimed that its alternative proposal would provide "$225 million of net value," when in fact NexPoint does not offer anything close to that amount.  NexPoint's later solicitations made similarly false claims.

## H.  NexPoint's Misconduct Is Causing Irreparable Harm

67.     Due to NexPoint's violations of federal securities laws, MCC and its shareholders have been, and will continue to be, irreparably harmed in the following respects:

(a)     NexPoint's violations of the federal securities laws and the proxy rules are granting it an unfair advantage in its efforts to scuttle the Merger.

(b)     NexPoint's unlawful conduct, if not halted, threatens the MCC shareholders' right

to the fair and informed exercise of the shareholder franchise.

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of Section 14(a) of the Exchange Act and Rules 14a-3 to 14a-6)

68.    MCC repeats and re-alleges each and every allegation above as if set forth in full herein.

69.    Under Rule 14a-3(a) of the Exchange Act, 17 C.F.R. § 240.14a-3(a), "[n]o solicitation subject to this regulation shall be made unless each person . . . is furnished . . . with a publicly-filed written proxy statement."

70.    Defendant NexPoint wrongly claimed exempt status when it issued press releases advocating for an alternative transaction and opposing the Merger, which plainly constituted "solicitations" subject to Rule 14a-3(a).  While Defendant NexPoint purported to rely on the exemption in Rule 14a-2(b)(1), that exemption does not apply to any person who is opposing the Merger and who has "propose[d] an alternative transaction to which such person or one of its affiliates is a party."  17 C.F.R. § 240.14a-2(b)(1)(v).  It also does not apply to solicitations by a person who will receive a benefit that would not be "shared pro rata by all other holders of the same class of securities."  *See* 17 C.F.R. § 240.14a-2(b)(1)(ix).  Thus, NexPoint's supposedly exempt solicitations violated Rule 14a-3.

71.    While NexPoint subsequently realized that it did not qualify for the exemption and attempted to file a preliminary proxy statement, it cannot do so.  In its Adopting Release, the SEC made clear that one who relies on Rule 14a-2(b)(1) for exemption is "deemed to have made an irrevocable election to maintain exempt status throughout the relevant soliciting period."  57 Fed. Reg. at 48,281.  Accordingly, it is bound by its irrevocable election of exempt status for the duration of the solicitation period.  Because NexPoint cannot undertake a regulated solicitation

after having attempted an exempt solicitation, all of its subsequent solicitations violated Rule 14a-3.

72.     Thus, NexPoint's solicitations have violated, and continue to violate, Section 14(a) of the Exchange Act and Rule 14a-3.

73.     MCC has no adequate remedy at law.

74.     Without the injunctive relief requested herein, MCC will suffer irreparable injury. NexPoint's failure to conduct their solicitation in compliance with the federal securities laws is depriving MCC and its shareholders of the information necessary to evaluate their solicitations and their aims and securing for NexPoint an unfair advantage in its efforts to scuttle the Merger. Preliminary injunctive relief in advance of the special meeting of MCC's shareholders is necessary to ensure that MCC shareholders are not deprived of their right to the fair and open exercise of the shareholder franchise.

75.     Separate and apart from the irreparable harm MCC has suffered and will continue to suffer, NexPoint's actions have caused MCC to suffer substantial monetary damages, including fees and expenses that would not have been incurred but for NexPoint's improper actions.  MCC was forced to retain lawyers, proxy solicitors, and investor-relations advisors to defend against NexPoint's illegal solicitation at a substantial cost.

## COUNT II
### (Violation of Section 14(a) of the Exchange Act and Rule 14a-9)

76.     MCC repeats and re-alleges each and every allegation above as if set forth in full herein.

77.     Rule 14a-9 under the Exchange Act, 17 C.F.R. § 240.14a-9, prohibits making a solicitation "by means of any . . . communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or

misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."

78.     NexPoint's press releases constitute solicitations within the meaning of Rule 14a-9, pursuant to the definition set forth in Rule 14a-1(l), 17 C.F.R. § 240.14a-1(l).

79.     By stating in its solicitation that its alternative proposal would provide "$225 million of net value," when in fact NexPoint is not offering to acquire any MCC shares and is only offering to provide $25 million to the combined company at the outset of the transaction, NexPoint's press release is false or misleading with respect to a material fact, or omits to state a material fact necessary in order to make the statements therein not false or misleading.

80.     Additionally, NexPoint's press releases are false or misleading to the extent they imply that NexPoint is ready, willing, and able to consummate the alternative transaction as proposed, when, in fact, on information and belief, NexPoint lacks the resources and capability to carry out the transaction.

81.     Accordingly, NexPoint violated Section 14(a) of the Exchange Act and the Rule 14a-9.

82.     MCC has no adequate remedy at law.

83.     Without the injunctive relief requested herein, MCC will suffer irreparable injury. NexPoint's false or misleading solicitations are depriving MCC and its shareholders of the information necessary to evaluate their solicitations and their aims and securing for NexPoint an unfair advantage in their efforts to scuttle the Merger.  Preliminary injunctive relief in advance of the special meeting of MCC's shareholders is necessary to ensure that MCC shareholders are not deprived of their right to the fair and open exercise of the shareholder franchise.

84.     Separate and apart from the irreparable harm MCC has suffered and will continue

to suffer, NexPoint's actions have caused MCC to suffer substantial monetary damages, including fees and expenses that would not have been incurred but for NexPoint's improper actions.  MCC was forced to retain lawyers, proxy solicitors, and investor-relations advisors to defend against NexPoint's false or misleading solicitations at a substantial cost.

## **PRAYER FOR RELIEF**

WHEREFORE, MCC respectfully requests that the Court enter judgment against NexPoint as follows:

(a)     Declaring that NexPoint is not eligible for the exemption from the proxy solicitation rules provided under Rule 14a-2(b)(1);

(b)     Declaring that NexPoint's solicitation activities violates Section 14(a) of the Exchange Act and Rules 14a-3 to 14a-6 and 14a-9;

(c)     Enjoining NexPoint from engaging in any action in furtherance of unlawful solicitation activity in connection with the special meeting of the MCC shareholders;

(d)     Requiring NexPoint to file with the SEC corrective disclosures consistent with their obligations under Section 14(a) and Rule 14a-9;

(e)     Awarding MCC, as damages, its reasonably incurred costs, fees, and expenses as a result of NexPoint's unlawful activities;

(f)     Awarding MCC the costs and disbursements of pursuing this action, including, but not limited to, MCC's attorney's fees and expenses; and

(g)     Granting MCC such other and further relief as this Court may deem just and proper.

Dated:  May 31, 2019
        New York, New York

                            /s/ Steven F. Molo
                            Steven F. Molo
                            Caleb Hayes-Deats
                            MOLOLAMKEN LLP
                            430 Park Avenue
                            New York, NY 10022
                            Tel: (212) 607-8160
                            Fax: (212) 607-8161

                            *Attorneys for Medley Capital Corporation*